United States District Court
Eastern District of New York

----------------------------------X

Weida Freight System, Inc.,

              *Plaintiff,*            **Memorandum & Order**

   - against -                 No. 24-cv-7180 (KAM)(RML)

Jetson Electric Bikes LLC, et al.,

              *Defendants.*

----------------------------------X

**Kiyo A. Matsumoto, United States District Judge:**

Pending before the Court are three motions to dismiss filed by three of the four defendants in this action (Benjy Goldstein, Josh Sultan, and TruRide Tech, LLC ("TruRide") (collectively, "Moving Defendants")), (ECF Nos. 52, 55, 59[1]), seeking dismissal of the amended complaint, (ECF No. 38 ("Am. Comp.")), filed by plaintiff Weida Freight System, Inc. ("Weida"). TruRide also moved to dismiss for lack of personal jurisdiction. The fourth defendant, Jetson Electric Bikes LLC ("Jetson"), filed an answer. (ECF No. 43.) For the reasons explained below, the defendants' motions to dismiss are all respectfully DENIED as to all claims except for Claim Six (fraud), which is DISMISSED as duplicative of Claim Five (fraud in the inducement).

---

[1] Pincites in this Memorandum & Order refer to the page numbers as generated by CM/ECF.

<u>**BACKGROUND**</u>

### I.    Factual Background

This admiralty[2] case arises from an alleged breach of a maritime contract and subsequent alleged scheme by Defendants to evade Weida's maritime lien on Jetson's goods that had been in Weida's possession, specifically $3.5 million of electronic bike cargo.  (Am. Comp. ¶ 23.)  In its review of Plaintiff's factual allegations to determine the motions to dismiss for failure to state a claim, the Court "accept[s] as true all material factual allegations in the complaint and drawing all reasonable inferences in plaintiffs' favor." *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013) (citation omitted).

Weida is a licensed Non-Vessel Operating Common Carrier ("NVOCC"), freight forwarder, and logistics provider whose business includes the ocean-based transportation of goods in China, North America, Latin America, and Europe.[3,4]  (Am. Comp. ¶

---

[2] This Court will use the terms "admiralty" and "maritime" interchangeably given that precedent cases do the same. *See, e.g.*, *Adamson v. Port of Bellingham*, 907 F.3d 1122, 1125 n.4 (9th Cir. 2018) ("We use the terms 'admiralty' and 'maritime' interchangeably, as the relevant caselaw often uses both words without apparent distinction." (quotations omitted)); *Rhode Island v. Shell Oil Prods. Co.*, 35 F.4th 44, 61 n.18 (1st Cir. 2022) (same); *Misener Marine Const., Inc. v. Norfolk Dredging Co.*, 594 F.3d 832, 835 n.2 (11th Cir. 2010) (same); *Weaver v. Hollywood Casino-Aurora, Inc.*, 255 F.3d 379, 381 n.2 (7th Cir. 2001) (same).

[3] For factual allegations derived from the Amended Complaint, the Court omits quotation marks in this section of the Memorandum & Order.

[4] In *Ventura*, the Second Circuit explained the role of NVOCC's and freight forwarders in ocean-based transportation of goods:

An ocean freight forwarder is an entity that arranges transportation of

9.)  Jetson is a company that sells e-mobility products, including electric scooters, electric bikes, and hoverboards.  (*Id.* ¶ 10.)

---

goods on behalf of a shipper from a United States location to an overseas location. The freight forwarder, acting as the shipper's agent, takes delivery of the goods, routes them to their destination, prepares documentation, arranges for any necessary storage, and completes any other tasks relating to the movement of the goods. Freight forwarders must be licensed by the Federal Maritime Commission ("FMC"), *see* 46 C.F.R. § 510.3 (1977), and are strictly regulated, *id.* § 510.

The ocean freight forwarder arranges for an "oceangoing common carrier," *see id.* § 510.21(c), to transport the goods to their ultimate destination. Oceangoing common carriers are divided into two categories based upon whether or not they transport goods on their own ships: a vessel-operating common carrier ("VOCC") is a [shipping] company that transports the goods overseas on its own ships; an NVOCC is a common carrier without ships. *See id.* § 510.21(d). The NVOCC, unable itself to move the goods overseas, usually performs such services for the shipper as consolidating small cargoes in large containers in order to obtain better rates from VOCCs; on occasion NVOCCs perform special services such as supplying trucks and heavy lifting equipment.

...

A shipper retains a freight forwarder because of the freight forwarder's expertise in securing the dispatch of cargo to a foreign destination. Because of this expertise and the freight forwarder's greater access to information from NVOCCs and VOCCs, the shipper relies on the freight forwarder's representations regarding the suitability, efficiency, and economy of using certain carriers, the availability of ships, and other matters relating to the shipment. Moreover, because of the shipper's inability to monitor every step in the shipping process, the freight forwarder must often make arrangements for shipment details without express approval for these arrangements from the shipper. The freight forwarder thus exercises considerable control over the transport-related decisions of the shipper. In describing the shipping industry, the government's expert witness termed the relationship between a shipper as principal and freight forwarder as agent a fiduciary relationship of the greatest trust and fidelity, and stated that the freight forwarder has the obligation of trying to obtain for the shipper the cheapest and the most efficient and most economical transportation that he can. Recognizing the nature of this relationship, courts have described freight forwarders as "agents of the shipper" for the purposes of arranging cargo transport, *United States v. American Union Transport, Inc.,* 327 U.S. 437, 443, 66 S.Ct. 644, 647, 90 L.Ed. 772 (1946), and as, essentially, "export departments for their shipper clients," *New York Foreign Freight Forwarders and Brokers Ass'n v. Federal Maritime Comm'n,* 337 F.2d 289, 292 (2d Cir.1964), *cert. denied,* 380 U.S. 910, 85 S.Ct. 893, 13 L.Ed.2d 797 (1965).

*United States v. Ventura*, 724 F.2d 305, 306-07, 310-11 (2d Cir. 1983) (citation modified).

Mr. Sultan was the Chief Executive Officer of Jetson; Mr. Goldstein was a shareholder in Jetson who was primarily responsible for all financial decisions and issues for Jetson, including its negotiations with Weida over Jetson's outstanding shipping debt. (*Id.* ¶¶ 11-12.)  Jetson engaged Weida to provide freight forwarding and logistics services relating to the ocean-based shipment of Jetson's products, which primarily consisted of electric bikes. (*Id.* ¶ 13.)

Over time, Jetson fell behind in its payment obligations to Weida.  (*Id.* ¶ 14.)  Weida consistently demanded payment from Jetson but was told by Mr. Goldstein and Mr. Sultan that the outstanding sums would be paid and that it was critical for Weida to continue to take Jetson's bookings and provide Weida's services in order to keep Jetson in business.  (*Id.* ¶ 15.)  In 2023, when Jetson submitted a new bid for Weida's services, Jetson and Weida agreed that Weida could charge interest on the unpaid amounts due in the amount of 1.5% per month until such time as the account became current.  (*Id.* ¶ 17.)  By the early part of 2024, Jetson owed Weida millions of dollars for freight forwarding and logistics services that Weida provided to Jetson.  (*Id.* ¶ 16.)

As provided for in Weida's bill of lading (as well as federal maritime law[5]), Weida retained a maritime lien over Jetson's goods

---

[5] "For centuries, courts have held that people who own and operate a vessel have a lien on the cargo transported on their ships."  *Saray Dokum v. Madeni Aksam Sanayi Turizm A.S.*, No. 17-cv-7495 (JPC)(GWG), 2023 WL 5164211, at *14 (S.D.N.Y.

in its possession for services provided.  (*Id.* ¶ 18.)  In early 2024, Weida informed Jetson that, because of Jetson's nonpayment, Weida intended to assert its maritime lien on approximately $3.5 million of Jetson's goods that were in transit and in Weida's possession (the "Liened Cargo").  (*Id.* ¶¶ 19, 23.)

In May 2024, Weida's intention to assert its maritime lien set in motion a scheme by Mr. Goldstein and Mr. Sultan to induce Weida to release possession of the Liened Cargo in exchange for two payment plans negotiated on May 7, 2024 and May 23, 2024 (collectively, "May 2024 Payment Plan Agreements").  (*Id.* ¶¶ 20, 32-34.)  Mr. Goldstein and Mr. Sultan did not reveal to Weida, however, that Jetson was severely undercapitalized and could never sell the Liened Cargo to repay Weida because the Liened Cargo was already encumbered to another creditor, The CIT Group / Commercial Services, Inc. ("CIT").  (*Id.* ¶¶ 25-27.)  Upon Weida's release of possession of the Liened Cargo pursuant to the May 2024 Payment Plan Agreements, CIT took possession of the Liened Cargo and resold it to TruRide (a company that soon thereafter owned and operated Jetson and in which Mr. Goldstein has an ownership interest).  (*Id.* ¶¶ 40-46.)  In sum, Weida lost possession of the Liened Cargo, and

---

Aug. 11, 2023) (collecting cases) (quoting *Logistics Mgmt., Inc. v. One (1) Pyramid Tent Arena*, 86 F.3d 908, 913 (9th Cir. 1996)).  "Maritime liens arise only by operation of law and not by contract."  *ING Bank N.V. v. M/V TEMARA, IMO No. 9333929*, 892 F.3d 511, 519 (2d Cir. 2018) (citing, *inter alia*, *Newell v. Norton*, 70 U.S. (3 Wall.) 257, 262 (1865) ("Maritime liens are not established by the agreement of the parties. ... They are consequences attached by law to certain contracts, and are independent of any agreement between the parties that such liens shall exist.")

Jetson never fulfilled its repayment obligations to Weida under the May 2024 Payment Plan Agreements.  (*Id*. ¶¶ 35, 39.)

## II.  Procedural Background

On October 7, 2024, Weida commenced this action against defendants Benjy Goldstein, Josh Sultan, and Jetson Electric Bikes LLC in the Southern District of New York.  (ECF No. 1.)  On October 8, 2024, Judge Gregory Woods ordered Weida to show cause why the action should not be transferred to the Eastern District of New York. (ECF No. 10.)  Weida consented to the transfer, (ECF No. 11), and the action was transferred to this district and assigned to this Court on October 11, 2024.  (ECF No. 13.)

After the parties participated in unsuccessful mediation, (*see* September 4, 2025 Docket Entry), Weida filed an amended complaint, which included claims against an additional defendant, TruRide Tech, LLC.  (ECF No. 38.)  Three of the four defendants (Benjy Goldstein, Josh Sultan, and TruRide Tech, LLC) filed motions to dismiss.  (ECF Nos. 52, 55, 59.)  All three Moving Defendants moved under Rule 12(b)(6) to dismiss for failure to state a claim upon which relief can be granted.  (*Id*.)  Additionally, Defendant TruRide Tech, LLC moved under Rule 12(b)(2) to dismiss for lack of personal jurisdiction.  (ECF No. 59.)  Weida filed a consolidated response in opposition to the Goldstein and Sultan motions to dismiss, (ECF No. 53), and a separate response in opposition to TruRide Tech, LLC's motion to dismiss.  (ECF No. 60.)

6

## III. Summary of Claims

Weida asserts the following claims in its operative amended complaint:

|  | Nature of Claim | Defendants |
|---|---|---|
| **Claim One** | Breach of Contract | Jetson, Goldstein, Sultan |
| **Claim Two** | Quantum Meruit | Jetson |
| **Claim Three** | Unjust Enrichment | Jetson |
| **Claim Four** | Account Stated | Jetson, Goldstein, Sultan |
| **Claim Five** | Fraud in the Inducement | Jetson, Goldstein, Sultan |
| **Claim Six** | Fraud | Jetson, Goldstein, Sultan |
| **Claim Seven** | Successor Liability | TruRide |

## LEGAL STANDARD

## I.   Federal Maritime Law

"Under the Constitution, federal courts possess authority to create and apply maritime law." *Great Lakes Ins. SE v. Raiders Retreat Realty Co., LLC*, 601 U.S. 65, 69 (2024). "Article III of the Constitution extends the federal judicial power to 'all Cases of admiralty and maritime Jurisdiction.'" *Id*. (quoting U. S.

Const., Art. III, § 2, cl. 1.) "That grant of jurisdiction contemplates a system of maritime law coextensive with, and operating uniformly in, the whole country." *Id.* (internal quotations omitted). "To maintain that uniform system, federal courts make decisional law for maritime cases." *Id.* (internal quotations omitted). "When a federal court decides a maritime case, it acts as a federal common law court, much as state courts do in state common-law cases." *Id.* (internal quotations omitted).

"Subject to direction from Congress, the federal courts fashion maritime rules based on, among other sources, judicial opinions, legislation, treatises, and scholarly writings." *Id.* at 70 (internal quotations omitted). "In the absence of an established rule, federal courts may create uniform maritime rules." *Id.* (citation omitted). "When no established rule exists, and when the federal courts decline to create a new rule, federal courts apply state law." *Id.* (citation omitted). In other words, the applicability of state law in federal maritime cases is strictly limited to instances when federal courts cannot identify an "established rule" in maritime law and decline to exercise their "authority to create and apply maritime law." *Id.* at 69-70 (citation omitted). As explained in the Discussion section, *infra*, at I.C and I.D, the Court will apply federal maritime choice of law rules and substantive federal maritime law.

8

## II. Rule 12(b)(2)

"On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996) (citation omitted). "Prior to discovery, a plaintiff may defeat a motion to dismiss based on legally sufficient allegations of jurisdiction." *Id.* (citation omitted).

"[T]he law of the forum state — here, New York — governs the issue of personal jurisdiction in admiralty cases." *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 937 F.2d 44, 50 (2d Cir. 1991). New York state law recognizes imputation of personal jurisdiction on successor entities "where the predecessor entity would be subject to specific personal jurisdiction in New York on the claims at issue." *Lelchook v. Societe Generale de Banque au Liban S.A.L.*, 147 F.4th 226, 237 (2d Cir. 2025) (citing *Lelchook v. Societe Generale de Banque au Liban S.A.L.*, 239 N.E.3d 172, 175 (2024)).

## III. Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## DISCUSSION

### I.   General Principles

#### A.   Subject Matter Jurisdiction

Weida's operative complaint invokes both admiralty jurisdiction and diversity jurisdiction as independent bases for this Court's subject matter jurisdiction. (Am. Comp. ¶¶ 6-8.) "In cases where admiralty jurisdiction is not exclusive and a claim may be brought either in admiralty or in diversity, the plaintiff may choose the jurisdictional grounds on which to bring the action." *Dluhos v. Floating & Abandoned Vessel, Known as New York*, 162 F.3d 63, 73 (2d Cir. 1998) (citing Fed. R. Civ. P. 9(h)). Here, Weida has elected to proceed under the Court's admiralty jurisdiction under Rule 9(h). (Am. Comp. ¶ 6.) The consequences of Weida's invocation of the Court's admiralty jurisdiction "are limited to procedure" because "the substantive law of admiralty" would apply to "claims permissibly brought in both admiralty and diversity" "to ensure the uniform application of admiralty law."[6]

---

[6] Given the distinctively maritime nature of Weida's claims (all arising from the alleged nonpayment of a maritime shipping contract and a subsequent fraudulent inducement to obtain release of the Liened Cargo), this Court, sitting in admiralty, need not reach the issue of whether it, in the alternative, would have diversity jurisdiction or whether this action falls into the "certain classes of cases ... cognizable only in admiralty," for which "diversity will not lie." *Dluhos*, 162 F.3d at 71.

*Dluhos*, 162 F.3d at 73 (citation modified).

## B.    Personal Jurisdiction

Weida's operative complaint alleges that Jetson is a New York limited liability company ("LLC") and that Mr. Goldstein and Mr. Sultan (both New York residents) are the sole members.  (Am. Comp. ¶¶ 2-4.)  The only defendant challenging personal jurisdiction is TruRide, a Texas limited liability company with its principal place of business in Delaware.  (Am. Comp. ¶ 5.)  Given that (i) "the law of the forum state — here, New York — governs the issue of personal jurisdiction in admiralty cases," *Klinghoffer*, 937 F.2d at 50, (ii) New York state law recognizes imputation of personal jurisdiction on successor entities, *see Lelchook*, 147 F.4th at 237, and (iii) Weida has plausibly alleged TruRide's successor liability,[7] the Court has personal jurisdiction over TruRide. TruRide's motion to dismiss for lack of personal jurisdiction is respectfully DENIED.

## C.    Choice of Law

The parties appear confused on the applicable choice of law.[8] "[W]hen parties properly invoke admiralty jurisdiction, courts apply federal maritime choice-of-law rules."  *Blue Whale Corp. v.*

---

[7] As discussed in the Court's analysis of TruRide's motion to dismiss Weida's successor liability claim (Claim Seven) on Rule 12(b)(6) grounds, *see infra*, Weida has plausibly alleged TruRide's successor liability for Weida's claims against Jetson.

[8] For example, both TruRide and Weida incorrectly presume New York choice-of-law rules apply to the Court's successor liability analysis.  (*See* ECF Nos. 59-1 at 16, 60 at 12.)

*Grand China Shipping Dev. Co.*, 722 F.3d 488, 498 (2d Cir. 2013) (citation omitted).  This Court, sitting in admiralty, applies federal maritime choice-of-law rules in this case.

### D.   Substantive Law

The parties dispute the applicable substantive law, especially for Weida's successor liability claim (Claim Seven). (*See* ECF Nos. 59-1 at 16, 60 at 12.)  Under federal maritime choice-of-law rules, the Court must decide the applicable "source of substantive law" because "[a]dmiralty jurisdiction and federal maritime law need not go hand-in-hand, even in the context of examining corporate identity."  *Blue Whale*, 722 F.3d at 497 (citation modified).  Although Second Circuit precedent does not, as a blanket rule, "*compel*[] courts examining corporate identity to apply federal common law," "federal courts sitting in admiralty have tended to apply federal maritime common law."  *Id*. at 498 (citation modified) (emphasis added).  "When the choice is between state law and federal common law, the federal interest in maintaining uniformity in the quintessentially federal realm of admiralty supersedes any competing interest in applying state law."  *Id*. at 497 (citation omitted).  The Court therefore applies substantive federal maritime common law.

### E.   Liability for LLC Members

Mr. Goldstein and Mr. Sultan argue that they cannot be personally liable for Weida's claims against Jetson because

12

Weida's operative complaint does not plausibly allege that Jetson's corporate veil should be pierced. (*See* ECF Nos. 52-1 at 13-15, 55-1 at 5.)  This argument is meritless because, as alleged, Mr. Goldstein and Mr. Sultan perpetrated an elaborate, multi-million-dollar fraudulent scheme in Jetson's name to induce Weida to release possession of the Liened Cargo pursuant to the May 2024 Payment Plan Agreements that, unbeknownst to Weida, Jetson was incapable of fulfilling because the Liened Cargo was already encumbered to CIT.  Under federal maritime law, if an individual "use[s] the corporate entity to perpetrate a fraud," he has satisfied the "[t]he test for piercing the corporate veil." *Dow Chem. Pac. Ltd. v. Rascator Mar. S.A.*, 782 F.2d 329, 342 (2d Cir. 1986) (citation modified).  Given that, at the motion to dismiss stage, the Court assumes as true the facts alleged in the operative complaint, Mr. Goldstein and Mr. Sultan's alleged fraudulent scheme permits Weida to pierce Jetson's corporate veil and hold them personally responsible for Weida's claims against Jetson.[9]

### F.    Successor Liability (Claim Seven)

Federal maritime law recognizes both alter ego and successor liability for corporate entities.  *See Pink Goose (Cayman) Ltd. v.*

---

[9] Mr. Sultan's argument that he cannot, as a matter of law, be held personally liable because he "is merely alleged to have been present or to have agreed" and that the operative amended complaint does not attribute "actual words or statements" to him is unavailing. (ECF No. 55-1 at 3-4.)  Mr. Sultan's position as the Chief Executive Officer of Jetson and presence at the execution of the May 2024 Payment Plan Agreements is sufficient at the pleading stage to establish a reasonable inference that Mr. Sultan acted in concert with Mr. Goldstein to carry out the fraudulent scheme in Jetson's name.

13

*Sunway Traders LLC*, No. 08-cv-2351 (HB), 2008 WL 4619880, at *2 (S.D.N.Y. Oct. 17, 2008) (collecting cases).  In *Pink Goose*, the Court recognized that the plaintiff had sufficiently alleged either alter ego or successor liability where the corporate entities at issue were "controlled by common directors and officers," operated as "a single economic unit," where the successor "assumed [the predecessor's] assets and liabilities," and where the predecessor was "under-capitalized."  *Id*. at *1.

In analyzing the contours of alter ego and successor liability, the Second Circuit has, in a non-maritime case, provided helpful guidance that the Court applies here.  *See Ret. Plan of UNITE HERE Nat. Ret. Fund v. Kombassan Holding A.S.*, 629 F.3d 282 (2d Cir. 2010).  *First*, "the test of alter ego status is flexible, allowing courts to weigh the circumstances of the individual case, while recognizing that the following factors are important: whether the two enterprises have substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership."  *Id*. at 288 (citation modified).  *Second*, whether "the entities exist simultaneously" does not alone defeat "alter ego status."  *Id*.  *Third,* "the alter ego doctrine is ... applied in situations involving successor companies" either "where the successor is merely a disguised continuance of the old [corporate entity]" or "where the companies are parallel companies."  *Id*. (citation modified).

14

Weida's complaint adequately alleges successor liability because TruRide and Weida engaged in a merger after which "TruRide ... owned Jetson," and "Jetson ... ceased operating as an independent entity," becoming "wholly owned and operated by TruRide." (Am. Comp. ¶¶ 40-41, 44.) As alleged, the scheme involved a sale-and-repurchase through CIT to which the Liened Cargo was previously encumbered without Weida's knowledge. (Am. Comp. ¶¶ 25, 42.) TruRide repurchased the Liened Cargo from CIT to "operat[e] the same business that Jetson did ... under a new corporate entity." (Am. Comp. ¶ 42.) Mr. Goldstein allegedly "has an ownership interest in TruRide," and "[m]any of Jetson's officers and employees have simply moved over to TruRide where they have the same job titles and responsibilities they did when employed by Jetson." (Am. Comp. ¶¶ 45-46.) In sum, Weida has adequately alleged that TruRide "is merely a disguised continuance of" Jetson such that TruRide can be liable, as in *Pink Goose*, under an alter ego or successor liability theory. *See Kombassan Holding*, 629 F.3d at 288; *Pink Goose*, 2008 WL 4619880, at *2. TruRide's motion to dismiss Claim Seven (successor liability) is respectfully DENIED.

## II. Breach of Contract (Claim One)

The Moving Defendants do not dispute that Jetson owes Weida over $4 million for unpaid freight forwarding and logistics services. (*See* ECF No. 52-1, Goldstein Motion to Dismiss, at 6

15

("Weida ... allowed Jetson to run up a debt of over $4 million"); ECF No. 55-1, Sultan Motion to Dismiss, at 3 ("Weida has nothing more than a breach of contract claim against Jetson"); ECF No. 59-1, TruRide Motion to Dismiss, at 6 (characterizing the dispute at issue "a garden variety contractual payment dispute" between Weida and Jetson).)  The Moving Defendants merely argue that they are shielded from liability for Jetson's breach of contract because, in their view, Weida cannot impose successor liability on TruRide or personal liability on Mr. Goldstein and Mr. Sultan.  The Court has rejected these arguments, *see supra*, and therefore the Moving Defendants' motions to dismiss Claim One are respectfully DENIED.

## III. Quantum Meruit and Unjust Enrichment (Claims Two and Three)

Weida brings quantum meruit and unjust enrichment claims (Claims Two and Three) against Jetson only, and these claims are therefore not at issue in the pending motions to dismiss.

## IV.  Account Stated (Claim Four)

Mr. Goldstein and Mr. Sultan move to dismiss Weida's account stated claim.  "To state a claim for an account stated, the plaintiff must plead that: (1) an account was presented; (2) it was accepted as correct; and (3) debtor promised to pay the amount stated." *Zim Am. Integrated Shipping Servs. Co., LLC v. Sportswear Grp., LLC*, 550 F. Supp. 3d 57, 67 (S.D.N.Y. 2021) (citation modified).  The Moving Defendants do not dispute Jetson's nonpayment, and Weida has adequately alleged that the May 2024

16

Payment Plan Agreements were a promise by Jetson to repay Weida for unpaid freight services. The motions to dismiss Weida's account stated claim (Claim Four) are respectfully DENIED.

## V.    Fraud in the Inducement (Claim Five)

Mr. Goldstein and Mr. Sultan move to dismiss Weida's claim of fraud in the inducement (Claim Five). The alleged object of the fraud was inducing Weida to release possession of the Liened Cargo. (Am. Comp. ¶¶ 76-86.) As alleged, Mr. Goldstein and Mr. Sultan induced Weida to enter into the May 2024 Payment Plan Agreements to effectuate the transfer of $3.5 million of goods subject to Weida's maritime lien, all the while knowing that these "assets had already been sold to a third-party weeks before" and that "Jetson would have no way of making the payments set forth in [the May 2024 Payment Plan Agreements]." (Am. Comp. ¶¶ 82-83.)

Fraud in the inducement would render the contracts at issue – here, the May 2024 Payment Plan Agreements – "voidable" and subject to "rescission" at Weida's election. *See* Restatement (Third) of Torts: Liab. for Econ. Harm § 9 (2020); *accord Denney v. BDO Seidman, L.L.P.*, 412 F.3d 58, 67 (2d Cir. 2005). "Rescission requires that all parties to the transaction be restored to the *status quo ante*, *i.e.* to the position they occupied before the challenged transaction." *Givaudan SA v. Conagen Inc.*, 128 F.4th 485, 498 (2d Cir. 2025) (quotations omitted). Here, however, for the reasons discussed below, the remedy of rescission

17

is inapplicable because, as alleged, Weida's maritime lien was never extinguished. Even if the May 2024 Payment Plan Agreements are voided due to fraud in the inducement, the underlying maritime lien was and is, under the facts alleged, enforceable under federal admiralty law.[10]

### A.    Maritime Liens

"For centuries, courts have held that people who own and operate a vessel have a lien on the cargo transported on their ships."[11] *Saray Dokum v. Madeni Aksam Sanayi Turizm A.S.*, No. 17-cv-7495 (JPC)(GWG), 2023 WL 5164211, at *14 (S.D.N.Y. Aug. 11, 2023) (collecting cases) (quoting *Logistics Mgmt., Inc. v. One (1) Pyramid Tent Arena*, 86 F.3d 908, 913 (9th Cir. 1996)). A maritime lien is "a security device" resulting in the lienholder "enjoy[ing] a special priority status" relative to other creditors. *In re World Imports Ltd.*, 820 F.3d 576, 583 (3d Cir. 2016) (citation modified). "[T]his privilege or lien ... is a secret one" because "it may operate to the prejudice of general creditors and purchasers without notice," even "rival claimants with land-based security interests ... created earlier in time." *Osaka Shosen Kaisha v. Pac. Exp. Lumber Co.*, 260 U.S. 490, 497 (1923); *Cornish*

---

[10]  The parties' briefs evince considerable confusion regarding the enforceability of maritime liens. Counsel for parties engaged in complex federal maritime litigation are expected to be well-versed in maritime law. The Court expects counsel for the parties to either learn the applicable maritime law or assist their clients in finding more knowledgeable counsel.

[11]  "This right applies equally to NVOCCs," like Weida. *Saray Dokum*, 2023 WL 5164211, at *14 (citing *Logistics Mgmt.*, 86 F.3d at 914).

18

*Shipping Ltd. v. Int'l Nederlanden Bank N.V.*, 53 F.3d 499, 503 (2d Cir. 1995). Here, Weida's maritime lien, secured by Jetson's goods, "enjoy[ed] a special priority status" over the interests of "general creditors" like CIT. *See In re World Imports Ltd.*, 820 F.3d at 583; *Osaka Shosen Kaisha*, 260 U.S. at 497.

"Maritime liens typically attach from the moment the cargo is loaded onto the ship" and are not released unless there is "*unconditional* delivery of the cargo." *Saray Dokum*, 2023 WL 5164211, at *15 (citation modified). Weida's *conditional* delivery of the Liened Cargo, pursuant to the May 2024 Payment Plan Agreements, did not, as matter of federal maritime law, release Weida's maritime lien on the Liened Cargo.

Moreover, "a maritime lien is not displaced by a sale" of the goods subject to the lien, and "the purchaser ... [takes] the title subject to all existing liens." *The Amelie*, 73 U.S. 18, 22-23 (1867) (citation modified). As the Second Circuit has recognized, a maritime lienholder can enforce its lien "through all ... transmutations" of the property and through any "proceeds of that property, into whose hands soever they may go":

> The lien created by a maritime pledge of freights follows the freights through all their transmutations, and wherever they can be found. It is familiar doctrine of the admiralty courts that a maritime lien attaches not only to the original subject of the lien, but also to whatever is substituted for it, and that the lienholder may follow the proceeds wherever he can distinctly trace them. Wherever there is a maritime lien upon property, it adheres to the proceeds of that property, into whose

19

> hands soever they may go, and these proceeds may be attached in the admiralty.

*Cornish Shipping Ltd. v. Int'l Nederlanden Bank N.V.*, 53 F.3d 499, 503 (2d Cir. 1995) (quoting *Bank of British North America v. Freights of the Hutton*, 137 F. 534, 536 (2d Cir.1905)).  Simply put, "a maritime lien cannot be extinguished except through the application of admiralty law."  *Barnes v. Sea Hawaii Rafting, LLC*, 889 F.3d 517, 534 (9th Cir. 2018) (citations omitted).

Here, the transfer of the Liened Cargo – whether from Jetson to CIT or CIT to TruRide – did not and could not extinguish Weida's maritime lien on the Liened Cargo.  TruRide's protestations that it is an "innocent party" and had "no involvement in the underlying payment dispute between Weida and Jetson," (ECF No. 59-1 at 6), are unavailing because "a maritime lien 'accompanies the property into the hands of a bona fide purchaser.'"  *Barnes*, 889 F.3d at 534 (quoting *Vandewater v. Mills*, 60 U.S. (19 How.) 82, 89 (1856)).

As alleged, Weida continues to have a valid and enforceable maritime lien of $3.5 million on Jetson's goods (or the proceeds of such goods, if sold) against whomever may possess the goods (or its proceeds).  Although the alleged fraud in the inducement succeeded in transferring possession of Jetson's goods subject to the maritime lien *first* from Weida to Jetson, *then* from Jetson to CIT, and *finally* from CIT to TruRide, the fraud in the inducement did not (and could not) succeed in extinguishing Weida's maritime

20

lien on the Liened Cargo or the proceeds from such cargo.[12]  Even if Weida were to prevail on its fraud in the inducement claim and obtain a rescission remedy, it would be in the same position it stands today with respect to its already-enforceable maritime lien.  Accordingly, a fraud in the inducement claim is not the proper claim by which to enforce its maritime lien, but it survives nonetheless as explained below.[13]

## B.    Enforcement of Maritime Liens

Under federal maritime law, the default enforcement mechanism of a maritime lien is an *in rem* proceeding pursuant to Rule C of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Federal Admiralty Rule C").[14]  Historically, plaintiffs seeking to enforce a maritime lien were only permitted to proceed *in rem* and only in the federal district where the *res* (i.e. the property at issue) was located.  *See, e.g.*, *The Bird of Paradise,* 72 U.S. (5 Wall.) 545, 555 (1866) ("Legal effect of such

---

[12] Of course, if Jetson had complied with its obligations under the May 2024 Payment Plan Agreements, the maritime lien would be released upon complete performance of such agreements.  "Where an owner and a lienholder have come to an arrangement for payment of an undisputed lien claim, failure to litigate the lien should be excused so long as the arrangement is being carried out." *Leopard Marine & Trading, Ltd. v. Easy St. Ltd.*, 896 F.3d 174, 197 (2d Cir. 2018) (citation modified) (quoting *In re Marine Transit Corp.*, 94 F.2d 7, 10 (2d Cir. 1938)).

[13] As discussed later, *see infra*, Weida's fraud in the inducement claim survives nonetheless because Weida may seek punitive damages as a remedy in addition to the (inapplicable) rescission remedy.

[14] In this district, a plaintiff must also comply with the local admiralty rules, including Local Admiralty Rules C.1-C.3, governing the procedures for transfer of possession of intangible property including the "control of freight or proceeds of property sold."

a [maritime] lien is, that the ship-owner, as carrier by water, may retain the goods until the freight is paid, or he may enforce the same by a proceeding *in rem* in the District Court."); *Leopard Marine & Trading*, 896 F.3d at 183 (acknowledging that "[c]ourts often speak as though physical presence of the res within the territorial jurisdiction of the district court, along with the attachment of the res, is a hard-and-fast jurisdictional prerequisite for an action in rem, particularly in admiralty").

Under modern admiralty law, however, plaintiffs enjoy significantly more flexibility in enforcing maritime liens.[15] Today, "there is no fundamental rule that actual seizure or possession of an object is always required for in rem jurisdiction over it." *Leopard Marine & Trading*, 896 F.3d at 188 (citing *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 312 (1950)). After all, "an action in rem, while ostensibly a suit against property itself, is in reality a convenient means of targeting the owner's interest in the property." *Leopard Marine & Trading*, 896 F.3d at 185 (citations omitted).

The Second Circuit's holding in *Leopard Marine & Trading* that "in personam adjudication of rights in a maritime lien" is permissible under admiralty law comports with Federal Admiralty

---

[15] As the Supreme Court has recognized, admiralty law is not overly formalistic: "[A]dmiralty's approach [is] to do justice with slight regard to formal matters" and "should not be tied to the mast of legal technicalities." *Continental Grain Co. v. The FBL-585*, 364 U.S. 19, 25 (1960) (citation modified).

22

Rule C, which provides, in relevant part, that "a party who may proceed in rem may also, or in the alternative, proceed in personam against any person who may be liable." Accordingly, under *Leopard Marine & Trading* and Federal Admiralty Rule C, Weida has three pleading options with respect to enforcement of its maritime lien – none of which involve pleading a fraud in the inducement claim.

*First*, under Rule 20 of the Federal Rules of Civil Procedure, Weida can proceed against the property itself by joining an *in rem* action to this pending case. Rule 20(a)(2) provides the proper mechanism to join an *in personam* action with an *in rem* action:

> Persons — as well as a vessel, cargo, or other property subject to admiralty process in rem — may be joined in one action as defendants if:
>
> (A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and
>
> (B) any question of law or fact common to all defendants will arise in the action.

Should Weida seek to enforce its maritime lien through this procedural mechanism, it should seek leave to file an amended complaint to join an *in rem* proceeding for the maritime lien to this *in personam* action pursuant to Rule 20(a)(2).

*Second*, Weida can seek "in personam adjudication of rights in a maritime lien" "under the Declaratory Judgment Act, 28 U.S.C. § 2201, to adjudicate maritime lien rights within an in personam action." *Leopard Marine & Trading*, 896 F.3d at 181, 189 (citation

23

modified). Even in a declaratory judgment action, the federal and local rules of admiralty apply because "cases brought under admiralty jurisdiction are subject to admiralty procedural rules." *Dluhos*, 162 F.3d at 73.

*Third*, Weida can proceed both *in rem* and *in personam*, under the aforementioned procedural mechanisms, "[t]o enforce any maritime lien." *See* Federal Admiralty Rule C.

In sum, the enforceability of Weida's maritime lien is agnostic to the outcome of Weida's fraud in the inducement claim concerning the May 2024 Payment Plan Agreements. The only mechanisms by which Weida can exercise its maritime lien are procedures set forth in Federal Admiralty Rule C and this district's Local Admiralty Rules.

## C.  Punitive Damages

Despite the unavailability of rescission as a viable remedy for Weida's fraud in the inducement claim, the claim may give rise to other remedies, including punitive damages. *See* Restatement (Third) of Torts: Liab. for Econ. Harm § 9 (Am. L. Inst. 2020) ("Punitive damages also may be available as a remedy for intentional misconduct.") The alleged scheme, in which Mr. Goldstein and Mr. Sultan induced Weida to enter into the May 2024 Payment Plan Agreements and thereby transfer the Liened Cargo subject to Weida's maritime lien, all the while knowing that these "assets had already been sold to a third-party weeks before" and

24

that "Jetson would have no way of making the payments set forth in [the May 2024 Payment Plan Agreements]," (Am. Comp. ¶¶ 82-83), states a viable fraud in the inducement claim and gives rise to the possibility of punitive damages that Weida seeks.  (Am. Comp. ¶ 86.)  Mr. Goldstein and Mr. Sultan's motions to dismiss Weida's fraud in the inducement claim (Claim Five) are respectfully DENIED.

## VI.   Fraud (Claim Six)

Weida's fraud claim (Claim Six) is duplicative of its fraud in the inducement claim (Claim Five) because it relies on the theory that Mr. Goldstein, Mr. Sultan, and Jetson "induc[ed] Weida" to transfer possession of the Liened Cargo – i.e., the same goods at issue in its fraud in the inducement claim.  (Am. Comp. ¶ 89.) Given that Weida "cannot allege a different set of facts or legal theories giving rise to a separate fraud claim from those giving rise to its fraudulent inducement claim, its fraud claim [Claim Six] is dismissed as duplicative," of its fraud in the inducement claim (Claim Five).  *CVI Invs., Inc. v. Mariano*, No. 19-cv-2960 (GBD) (SDA), 2019 WL 7067089, at *5 (S.D.N.Y. Dec. 20, 2019).

CONCLUSION

For the reasons explained in this Memorandum and Order, the defendants' motions to dismiss are all respectfully DENIED as to all claims except for Claim Six (fraud), which is DISMISSED as duplicative of Claim Five (fraud in the inducement).

Should Weida seek to amend its complaint to enforce its

25

maritime lien under Federal Admiralty Rule C and the applicable local rules, it shall file a letter motion seeking leave to amend by April 8, 2026.

Finally, the jury trial demand in Weida's amended complaint is STRICKEN because "there is no right to a jury trial in actions instituted in admiralty," and the Court will honor "the deeply rooted tradition of non-jury trials in admiralty cases." *Complaint of Great Lakes Dredge & Dock Co.*, 895 F. Supp. 604, 608-09 (S.D.N.Y. 1995) (citing, *inter alia*, *Fitzgerald v. United States Lines Co.,* 374 U.S. 16, 20 (1963)).

The parties are urged to participate in good faith settlement negotiations and otherwise referred to Magistrate Judge Levy for settlement and discovery.

**So ordered.**

Dated:    April 1, 2026
          Brooklyn, New York

_____
**Kiyo A. Matsumoto**
United States District Judge
Eastern District of New York

26